# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ROBERT WALKER, JR., JOHN KANE, CAROL KANE, and MARGARET FOULKE, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | C.A. No. 9667-VCG |
| CHARLES L. WILLIAMS, | ) ) ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

Date Submitted: March 2, 2016
Date Decided: June 23, 2016

Dean A. Campbell, of THE LAW OFFICE OF DEAN A. CAMPBELL, LLC, Georgetown, Delaware, *Attorney for Plaintiffs*.

Richard E. Berl, Jr., of BERL AND FEINBERG, LLP, Lewes, Delaware, *Attorney for Defendant*.

GLASSCOCK, Vice Chancellor

In his prose poem "Knoxville: Summer of 1915,"[1] James Agee described how commonplace sights and sounds of his boyhood—cicadas, horses, a trolley, auto traffic, the music made by water spraying from hoses—formed a reassuring and comforting backdrop, the shared experience of his small neighborhood. The testimony in the two-day trial in this matter stands as a dystopian counterpoint, a kind of "Milton: 2015."[2] The Defendant, Mr. Williams, has a not-uncommon hobby—working on cars—that he pursues with an uncommon vigor, in a large shop beside his house. The Plaintiffs, his neighbors, contend that the resulting sights, smells, and sounds have disturbed the quiet enjoyment of their property. These are issues that neighborly people could have resolved with reasonable give-and-take, and reached thereby a result superior to that which can be achieved through a binary court decision based upon property rights. Unfortunately, the parties were unable to achieve such a civil accommodation.

Accordingly, the Plaintiffs seek an injunction forcing Williams to remove the parts of his shop allegedly out of compliance with the Sussex County Zoning Code and Building Code (the "County Code") and to cease pursuit of his hobby. As with most nuisance claims, this inquiry is fact-driven: does Williams' use of his property

---

[1] James Agee, *Knoxville: Summer of 1915*, 5 The Partisan Review, no. 3, Aug.–Sept. 1938, at 22, 22–25.

[2] The parties all have Milton postal addresses. The small neighborhood in which they live is located in a rural and unincorporated area of Sussex County between Lewes and Harbeson, south of Cool Spring.

amount to an incidental intrusion onto his neighbors' property of the type, living in an actual rather than an ideal world, we all must endure; or is it so disruptive of the Plaintiffs' property rights as to justify a remedy in tort?  The matter was tried, and after careful review of the resulting record, I find the former.  The Plaintiffs' request for nuisance-based relief is accordingly denied.  The Plaintiffs also contend that an easement across Walker's property has been overburdened by use in furtherance of Williams' auto-repair hobby; I agree, and enjoin certain use of the easement by Williams and his guests.  Finally, the Plaintiffs allege that the use of the property is in violation of the County Code in numerous respects, in ways for which they have sought redress, unsuccessfully, from the County.  They seek relief here.  Those allegations require further briefing.  My reasoning follows.

## I. FACTS AND STAGE OF THE PROCEEDINGS

The following are the facts as I find them after trial, by a preponderance of the evidence.[3]  I include only those facts pertinent to the common-law nuisance claim and involving the easement.

*A. The Parties*

Defendant Charles Williams resides at 19833 Summer Place in Milton, Delaware.[4]  The Plaintiffs are Williams' current and former neighbors: Margaret

---

[3] Citations to the parties' joint trial exhibits appear as "JX," and to the trial transcript as "Trial Tr."
[4] Trial Tr. 156 (Williams).

Foulke, Robert Walker, Jr.,[5] and John and Carol Kane. Williams' property directly

borders that owned by Foulke and Walker.[6]

From July 30, 1999 to September 5, 2007, Williams owned the entire 5-acre

plot of land previously known as 27347 Martins Farm Road (a.k.a. County Road

291), which extended north from Martins Farm Road and bordered Foulke's

property to the west.[7] The entire parcel, together with Foulke's original lot, is

represented in Figure 1, below. On September 5, 2007, Williams subdivided his

property to create three lots: a front lot, labeled "Proposed Lot A" in Figure 1 below,

which borders Martins Farm Road; a middle lot, labeled "Proposed Lot B"; and a

rear lot.[8] In Figure 1, north is to the left:



**Figure 1**[9]

---

[5] Robert Walker, Jr. indicated at trial that he intended to rent out his property. *Id.* at 140:5–7
(Walker). Plaintiffs' Opening Post-Trial Brief suggests that he has since done so. Pls' Opening
Post-Trial Br. 16.
[6] JX 3.
[7] *Id.*
[8] JX 3, 40.
[9] JX 3.

Williams kept for himself the approximately 1.6-acre lot designated "Proposed Lot B" and deeded the other two lots to his neighbors, Plaintiff Foulke and non-party George DeFrehn, as tenants in common.[10] At the time of the subdivision, Williams had only a residence and two small sheds on Proposed Lot B.[11]

Through the deed conveying Proposed Lot A (the "Lot A Deed"), Williams retained a 50-foot wide right-of way (the "Easement") across the lot in order to connect his property, Proposed Lot B, to Martins Farm Road.[12] The Lot A Ddeed provides that:

> The Grantor [Williams] and Grantees [DeFrehn and Foulke], their respective heirs, successors and assigns agree to maintain jointly and keep clear the 50' right of way that serves as access to lands of the Grantor, identified as Proposed Lot B on the Plot referred to aforesaid to the end that said 50 foot access way which is paved shall be maintained and repaved as needed to keep it in reasonably good condition.[13]

A narrow strip of the Easement is now a paved lane known as Summer Place.[14] The language of the deed providing the right-of-way does not explicitly describe or restrict its use, other than to provide "access" to the Williams parcel.[15] After the

---

[10] JX 40.
[11] Trial Tr. 39 (Foulke).
[12] JX 40.
[13] *Id.*
[14] According to a Division Survey Plan prepared for Williams, a "typical residential access" can be up to 29 feet wide without special approval. JX 3. Testimony from a Sussex County Council hearing, however, indicates that Summer Place is actually only about 10 feet wide. JX 10 at 97:20.
[15] JX 40.

transaction, Foulke (and DeFrehn) owned a contiguous eight-plus acres surrounding Williams on three sides and separating his property from the public road.

In the fall of 2008, Plaintiff Foulke apparently sold the front parcel, Proposed Lot A, to the parents of Plaintiff Walker.[16] The following February, Walker built a residence on the front portion of the Proposed Lot A and began residing there permanently.[17] Walker's parents deeded him the lot in May 2011.[18] Currently, Walker's tenants occupy Proposed Lot A.[19]

*B. Mr. Williams Builds His Dream House*

Flush with cash from the sale of the front and rear lots, Williams pursued a long-held wish: owning a shop where he could pursue his hobby of working on cars.[20] Using his own labor and that of friends and neighbors, he built a 1,920 square-foot pole building with a 600 square-foot lean-to addition on the back, adjacent to his house trailer. Williams obtained a building permit, authorizing construction of the pole building, in September 2007,[21] and a certificate of occupancy in February 2008.[22]

---

[16] Trial Tr. 143 (Walker).
[17] *Id.* at 142 (Walker).
[18] JX 40.
[19] *See supra* note 5.
[20] Trial Tr. 162–63 (Williams).
[21] JX 4.
[22] JX 7.

Williams' pole building dwarfs his home. It faces the street down Summer Place lane, with two vehicle doors and a man door in its façade.[23] The building is situated 143.1 feet from Walker's property line and approximately 100 feet from Foulke's property line.[24] The building has its own electrical service,[25] and its own heating and air conditioning.[26] It has a cement floor[27] and amenities for working on cars that the average weekend tinkerer would drool over, including a raised-tray ceiling in one area that accommodates a hydraulic auto lift.[28] Williams decorated the exterior of the building with various items, including ornamental signs, an old phone booth, a parking meter, a traffic light, and a non-functioning Pepsi machine.[29]

The parties disagree over what to call this auto tinkerer's Taj Mahal. The Plaintiffs, probably endeavoring to equate it with a commercial garage, call it "the Garage"; Williams, perhaps sensing a disadvantage in that appellation,[30] refers to it

---

[23] JX 30 at 239.

[24] Pl's Opening Post-Trial Br. 10 (citing JX 2, 3). I note that Plaintiffs' Opening Post-Trial Brief conflicts with Foulke's testimony at trial: Foulke asserts that the Shop rests only 50 feet from her property line. Trial Tr. 44:13 (Foulke).

[25] JX 25 at 170.

[26] *Id.* at 171.

[27] *Id.* at 156.

[28] *Id.* at 160, 163. Inside the building, Williams has stocked several work stations with drawers full of parts, *id.* at 159; supplies of motor oil, *id.* at 166, 173; and car jacks. Williams is physically disabled, and testified that the paved floor of the shop and the lift are necessary to his pursuit of his hobby.

[29] JX 30.

[30] Perhaps Williams, like Moe Szyslak, finds "garage" effete and Frenchfied:
    Moe: The "garage"? Hey fellas, the "garage"! Well, ooh la di da, Mr. French Man.
    Homer: Well what do *you* call it?
    Moe: A car hole!
*See The Simpsons*, *The Springfield Connection* (Fox television broadcast May 7, 1995).

as his "man-cave."[31] I will refer to it in this Memorandum Opinion as "the Shop." Despite the Plaintiffs' original allegations, I find that Williams uses the Shop purely as a hobby and as a place to help and entertain friends; he does not pursue auto repair as a business.

### C. Relations Sour Between Mr. Williams and His Neighbors

According to all parties, Williams and his neighbors once lived peaceably next to one another; Foulke described Williams, prior to 2007, as "a very nice neighbor,"[32] and Williams agreed that they "enjoyed a good relationship [as] neighbors."[33] The relationship soured, according to Williams, only after he refused to assist Foulke and DeFrehn with a claim against a crane company for alleged damage to their driveway.[34] Foulke denies that any such claim was ever filed,[35] instead faulting Williams' use of his Shop for their conflict. Foulke made several complaints to the County, prompting numerous surprise inspections of the Shop, none of which found any violations in Williams' use of his property.[36]

In an attempt to put a stop to his neighbors' complaints, Williams filed in August 2012 an application for a conditional use permit to use his property, zoned

---

[31] Trial Tr. 188:17 (Williams).
[32] *Id.* at 24:15 (Foulke).
[33] *Id.* at 196:13–14 (Williams).
[34] *Id.* at 195–97 (Williams).
[35] *Id.* at 130 (Foulke).
[36] See generally the testimony of Dean Pettyjohn, a former employee of the Sussex County Zoning Department who conducted periodic inspections of the Shop. *Id.* at 207–22 (Pettyjohn).

"AR-1,"[37] as a commercial auto repair shop.[38] The conditional use permit was ultimately denied by the Sussex County Planning and Zoning Commission (the "Commission").[39] In its denial, however, the Commission made clear that—while it was prohibiting the operation of a *commercial* auto repair business—nothing in its decision prevented Williams from continuing his activities at the time: working with friends on their and his vehicles, without payment.[40] The Plaintiffs did not appeal the Commission's decision.[41]

The Plaintiffs instead proceeded with this action, in which they assert, among other things, that Williams' use of the Shop constitutes a public and private nuisance. The various allegations of the Complaint, as presented at trial, concern the number of cars traveling down Summer Place, loud noises from inside and outside the Shop, odors emitting from the Shop, and trespassing by visitors to the Shop on the Plaintiffs' neighboring property.[42]

---

[37] "AR-1" designates an agricultural residential district.
[38] JX 9.
[39] JX 12.
[40] *Id.* at 35–37.
[41] Instead, the Plaintiffs contend in their Complaint that "they have shown that they have exhausted all administrative remedies: administrative review would be futile . . . the issues do not involve administrative expertise but do require legal expertise with respect to the powers granted to the Council." Compl. ¶ 116.
[42] The following recitation of the facts is limited to those presented in the post-trial briefing.

1. <u>Volume of Cars In and Out of the Shop</u>

The Plaintiffs contend that the large number of cars that enter and exit Walker's property along Summer Place is inconsistent with its AR-1 zoning designation and constitutes a nuisance.

According to Williams, he allows friends to come by to work on their own vehicles for no compensation.[43]  Several friends visit weekly[44] to "hang out" in what Williams describes as his "man cave."[45]  A certain number of the cars on Williams' property can be attributed to Williams and others living on his property.  Williams' daughter Kayla and a friend named James Gromis reside permanently at the property.[46]  Williams has two other daughters, also of driving age, who visit, in addition to two brothers who periodically stay with Williams because of his close proximity to the beaches.[47]  The Defendant owns several vehicles himself: a 2009 Grand Marquis, a 1997 Grand Marquis, a 1964 Chevy truck, a 1967 Chevy truck, a 1959 Ford truck (off-premises), and an old, unregistered Model T.[48]  Additionally, Williams stores a few other vehicles on his property belonging to two friends, Al Sheldon and Al Thorpe, one of which is kept permanently in the Shop.[49]

---

[43] Trial Tr. 188 (Williams).  These friends, in the past, included Walker, his father, and DeFrehn. *Id.* at 193 (Williams).
[44] *Id.* at 296, 265, 270–71 (Williams).
[45] *Id.* at 188:17 (Williams).
[46] *Id.* at 176 (Williams).
[47] *Id.* at 177 (Williams).
[48] *Id.* at 178 (Williams).
[49] *Id.* at 179–80 (Williams).

Williams, in response to Plaintiffs' complaints about the volume of cars entering and exiting the Shop, began keeping a log of all vehicles and people entering his property.[50] Over the five-month period between July 11, 2014 and December 7, 2014, he noted a total of 614 people entering and exiting his property.[51] Aggregated over one year, this amounts to roughly 1,500 visitors per year, or between four and five visitors per day. In his testimony, Walker confirmed that the number of cars entering Williams' property averages four or five per day, but noted that he had seen as many as 13 cars enter in one day.[52]

Foulke maintains that the traffic along Summer Place is "excessive."[53] She also contends that Williams' log is internally inaccurate, as the summary Williams provides of his log fails to include approximately 25 individuals that he had noted entered his property throughout the five-month period detailed in the log.[54] Foulke kept her own, non-exhaustive list of cars entering and exiting Williams' property over the period spanning from July 10, 2013 to November 8, 2015.[55] She also began to surveille Williams' property by video, setting up an automatic camera trained on Williams' house day and night, to take photos of cars entering and exiting Williams'

---

[50] JX 16.
[51] *Id.*
[52] Trial Tr. 141 (Walker).
[53] *Id.* at 56:3 (Foulke).
[54] *Id.* at 75–76 (Foulke).
[55] Pl's Post-Trial Opening Br., Ex. A.

Shop.[56]  She also installed a "pinger" in her home to alert her whenever there was a vehicle on Summer Place.[57]  She contends that the number of cars entering and exiting the Shop was "too voluminous" to keep full records.[58]  In her testimony, Foulke emphasized several specific log entries where cars entered or exited the property early in the morning or late at night.[59]  Considering all this evidence, I conclude that traffic over the Easement averages around five vehicles per day and is sometimes greater.

Foulke also described several incidents that occurred outside the Shop involving visitors to Williams' property, including a few occasions where Foulke and her young niece saw men urinating outside the Shop,[60] several conversations involving "gutter language,"[61] occasions when visitors repeatedly made rude gestures directed at her;[62] and an incident occurring on Thanksgiving 2015 where someone revved an engine repeatedly for over an hour.[63]  Walker testified that he felt uncomfortable letting his young daughter play outside because of the frequent

---

[56] Trial Tr. 56:22–57:2 (Foulke).
[57] *Id.* at 124 (Foulke).
[58] *Id.* at 78:11 (Foulke).
[59] *Id.* at 78–80 (Foulke).
[60] *Id.* at 99 (Foulke).
[61] *Id.* at 100 (Foulke).
[62] *Id.* at 102 (Foulke).
[63] *Id.* at 100–01 (Foulke).

and fast traffic on Summer Place, and that, because of the Shop, he eventually decided to rent out his house.[64]

### 2. Noise

The Plaintiffs complain of "deafening" and "incessant" noises emitting from the Shop.[65] At trial, Foulke testified to hearing frequently noise from an air compressor, impact wrenches, and hammering on metal;[66] loud talking and music;[67] revving engines inside and outside the Shop;[68] and the screeching of tires being tested on Summer Place.[69] According to Plaintiff Carol Kane, who lives across the street from the other Plaintiffs and Williams,[70] the traffic volume and associated noise has "increased drastically" since Williams first constructed the Shop, and she frequently hears "squealing wheels" as cars turn in and out of the driveway.[71] Given Kane's location rather far from the Shop, and the fact that traffic over the public road necessarily dwarfs the use of Summer Place, I found Kane's testimony unconvincing. Finally, Foulke asserts that Williams often keeps the Shop doors open while performing work on cars, while Williams contends the doors remain closed.[72]

---

[64] *Id.* at 137–39 (Walker).
[65] Compl. ¶¶ 11, 32.
[66] Trial Tr. 47:23–24 (Foulke).
[67] *Id.* at 48:10–11 (Foulke).
[68] *Id.* at 48:17–20 (Foulke).
[69] *Id.* at 49:3–7 (Foulke).
[70] *Id.* at 151 (Kane).
[71] *Id.*
[72] *Id.* at 47:5–18 (Foulke).

The Plaintiffs did not provide any decibel readings or sound recordings of the alleged noise, or any expert testimony concerning the level of noise.

### 3. Odors

Plaintiff Foulke also complains of odors from the Shop. At trial, she testified to "fumes" and "smoke" coming out of a cupola above the Shop, resulting from the repeated revving of car engines inside the Shop, and to "petroleum-type" odors from pressure washing engines.[73] On cross examination, Foulke asserted that the exhaust affects a lung condition, but conceded that no doctor has advised her to avoid exhaust fumes and provided no evidence of such a condition.[74] Foulke also testified that, while she keeps horses on her lot adjacent to the shop, these horses are themselves nearly odor-free.[75]

### 4. Trespassing

Finally, Foulke and Walker allege that visitors to the Shop have at times trespassed on their property. Foulke testified to incidents where people knocked on her door while looking for "an auto repair garage," wandered through her yard, and walked over to her barn to see the horses she keeps on her property.[76] She also asserts that cars have "parked on Mr. Walker's part of the right-of-way many

---

[73] *Id.* at 92-93 (Foulke).
[74] *Id.* at 116–17 (Foulke).
[75] *Id.* at 120 (Foulke). Foulke clearly believes that *her* horses create no odor, perhaps in the way my mother firmly believed that her children were handsome.
[76] *Id.* at 46 (Foulke).

13

times."[77]  Walker recounted an incident where his mailbox was ripped from its post, conceding that he has no evidence that the incident was related to this litigation, but stating that he perceived it as a personal threat.[78]

### D. Procedural History

The Plaintiffs filed a Verified Complaint on May 19, 2014, asserting two counts.  In Count I, the Plaintiffs seek to impose civil fines on the Defendant for alleged violations of the County Code; and in Count II, the Plaintiffs seek an order (1) enjoining Defendant's use of the Shop as an automotive repair garage; (2) requiring Defendant to remove any equipment or portion of the Shop that is inconsistent with the use of the structure as a "private garage," as defined by the County Code; (3) enjoining use of the Shop for vehicles owned by anyone other than the Defendant or relatives residing at his home; (4) preventing the grant of a special use permit for use the Shop as a commercial auto repair garage; (5) requiring the Defendant to remove all signs that advertise parts, products, services, and towing from the front of the Shop; and (6) declaring that the Easement be restricted to "normal residential vehicles" and permitting the Plaintiffs to install speed bumps and instructional signs prohibiting the backing and towing of other motorized vehicles. The matter was tried on December 1 and 2, 2015, and the parties completed post-

---

[77] *Id.* at 47:13–14 (Foulke).
[78] *Id.* at 148 (Walker).

trial briefing on March 2, 2016. This is my post-trial Memorandum Opinion, addressing the relief requested above to the extent it is based on common-law nuisance or the burden on the Easement.

## II. ANALYSIS

### A. *The Burden of Proof*

The Plaintiffs bear the burden of proof in this matter and must show by a preponderance of the evidence that they are entitled to recovery.[79] "Proof by a preponderance of the evidence means proof that something is more likely than not . . . [and] that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes [the finder of fact] believe that something is more likely true than not."[80]

### B. *The Common-Law Claims*

The Plaintiffs allege that Williams' pursuit of his hobby of auto repair on his property constitutes both a public and a private nuisance, and overburdens the easement on Walker's property.[81] I examine these claims below, in light of my findings of fact.

---

[79] *Prizm Group, Inc. v. Anderson*, 2010 WL 1850792, at *4 (Del. Ch. May 10, 2010).
[80] *Base Optics Inc. v. Liu*, WL 3491495, at *13 n.92 (Del. Ch. May 29, 2015) (quoting *In re El Paso Pipeline Partners L.P. Derivative Litig.*, 2015 WL 1815846, at *15 (Del. Ch. Apr. 20, 2015)).
[81] *See* Pls' Post-Trial Opening Br. 34 ("Plaintiffs have demonstrated the continued use of the [Shop] as a repair garage is a nuisance *per se*, it also constitutes a public nuisance.").

## 1. Public Nuisance

Equity may act to remedy a public nuisance, where "an unlawful act or omission to discharge a legal duty . . . endangers the lives, safety, health or comfort of the public or by which the public are obstructed in the exercise or enjoyment of a right common to all."[82] Inexplicably, to me, the Plaintiffs have argued in post-trial briefing that Williams has created a public nuisance by pursuit of his auto-repair hobby. No evidence indicates that the noxious results of that activity affect anyone other than Williams' immediate neighbors. Accordingly, the Plaintiffs' requests for relief based on a claim of public nuisance are denied.

## 2. Private Nuisance

Two types of private nuisance are recognized in Delaware.[83] This Court may enjoin a nuisance *per se*, that is "an interference with the property rights of another that is intentional; or such an interference resulting from abnormally hazardous activity on the defendant's property; or such an interference in violation of a statute intended to protect public safety."[84] The doctrine of nuisance *per se* is inapplicable under the facts here.[85] A nuisance-in-fact, by contrast, exists "where a defendant, although acting lawfully on his own property, permits acts or conditions 'which

---

[82] *Georgetown v. Vanaman*, 1988 WL 7388, at *4 (Del. Ch. Jan. 28, 1988) (citation omitted).
[83] *Beam v. Cloverland Farms Dairy, Inc.*, 2006 WL 2588991, at *2 (Del. Ch. Sept. 6, 2006).
[84] *Id.*
[85] I set aside any determination of Plaintiffs' claims under the County Code, and relief, therefore, which await further briefing.

16

become nuisances due to the circumstances or location or manner of operation or performance.'"[86] To obtain relief for a nuisance-in-fact, a plaintiff must prove by a preponderance of the evidence that "the use made by his neighbor of the neighbor's property constitutes an *unreasonable* invasion of the plaintiff's property rights, recognizing that 'the affairs of life . . . cannot be carried on without mutual sacrifice of comfort.'"[87] The Court must weigh the facts and conflicting interests of the parties involved to determine if the plaintiff seeks to protect the "reasonable or proper enjoyment of [his] property, and not some [hypothetical] unqualified right to uninfringed use."[88] The reasonableness of the use is determined from an objective point of view; that some "invasion" of another's interest in the use and enjoyment of his land has occurred does not necessarily mean that the invasion is unreasonable.[89] In other words, the analysis before me involves a balancing of property rights; I must determine whether, *objectively*, Williams' auto-repair activity on his property interferes with the Plaintiffs' reasonable enjoyment of their property, in light of the facts, including the character of the neighborhood in which the properties are situate. I conclude that it does not.

[86] *Beam*, 2006 WL 2588991, at *2 (quoting *Artesian Water Co. v. New Castle Cnty.*, 1983 WL 17986, at *15 (Del. Ch. Aug. 4, 1983)).
[87] *Id.* (quoting *Artesian Water Co.*, 1983 WL 17986, at *16) (emphasis in original).
[88] *Id.*
[89] Restatement (Second) of Torts § 826 cmt. c.

I begin by noting the obvious: an activity that would be noxious in a city residential neighborhood may be appropriate in the open countryside, or a largely commercial setting.[90] The parties here chose to purchase property and to live in an unincorporated, semi-rural area of Sussex County. The area surrounding these properties is similar to many areas of eastern Sussex County: acreage occupied by growing crops and chicken houses, with residential lots—which would be considered large in a town setting—along the road frontage. The original property at issue, consisting of five acres, was subdivided by Williams into three lots. No deed restrictions were imposed on Williams' lot through this subdivision, and no evidence suggests that Plaintiff Foulke demanded such restrictions when she purchased two of the three lots from Williams.[91] The Plaintiffs' lots abut a public roadway, Martins Farm Road. In other words, the Plaintiffs could have chosen to live in a town or in a restricted development; instead, they chose a property in a mixed neighborhood of large residential lots and commercial farming acreage, use of which is restricted only by the County Code and the common law. It is in light of this setting that I must evaluate the reasonableness of Williams' use of his property.

---

[90] *Compare Beam*, 2006 WL 2588991, *with Laumbach v. Westgate*, 2008 WL 3846419 (Del. Ch. Aug. 19, 2008).

[91] JX 40. The Lot A Deed, however, does include a number of restrictions on the use of Proposed Lot A only.

I first note that the relief requested is to enjoin Williams from use of his property for auto repair. Some of the complaints, particularly from Plaintiff Foulke, are unrelated to, or not necessary to, such use of the property. These include alleged trespassing by Williams' guests to look at her horses and, on at least one occasion, public urination by Williams' guests. These acts, I note, are separately actionable, perhaps criminal, and Foulke may certainly pursue them at law if they recur. They are not necessary to the pursuit of auto repair, nor do I find them sufficiently frequent to be taken as a part of Williams' hobby that the Plaintiffs seek to enjoin, and I do not consider them further here. I next turn to three types of annoyance that are associated with auto repair, which I find have been suffered by Walker and Foulke.[92]

### a. Noise

Foulke argues that the noise from the Williams' property associated with work on cars prevents her from the quiet enjoyment of her home. There is no expert testimony or objective evidence (such as a decibel-level reading) concerning noise in the record, and the testimony concerning noise levels is inconsistent. Nonetheless, it is clear that, at times, the activity on the Williams property is audible and annoying to Foulke. This includes the sound of impact wrenches and idling or revving engines. I note, however, that other potentially annoying sounds must be audible to

---

[92] The Kanes join the allegations of the Verified Complaint, but the record is silent as to any non-frivolous allegations of harm suffered by the Kanes as a result of Williams' activity.

the Plaintiffs as well, given the quality of the neighborhood. The Foulke and Williams parcels border a public road; that road is by no means a major highway but is an open County road, which cars and commercial vehicles traverse at a high rate of speed. To the rear of the properties are tilled fields and, not far removed, chicken houses, which also necessarily require the occasional presence of loud commercial vehicles and farming operations.[93]

Nothing in the record convinces me, in light of all the circumstances, that the noise emanating from the Defendant's property is excessive or so noxious that it would deprive a neighbor of typical sensibilities of the quiet enjoyment of her property, no matter how annoying that noise may be subjectively to Plaintiff Foulke.

### b. Odors

Foulke complains that, occasionally, she can smell odors associated with auto repair coming from the Williams property. She has observed "vapor" or "smoke"—presumably, auto exhaust—coming from the Shop. Again, I accept her testimony is both sincere and truthful. I must, however, examine that evidence in light of the circumstances of the respective properties. The area along Martins Farm Road is not a tightly settled residential neighborhood; it is a mixed area of commercial farming and houses. Foulke's house and Williams' Shop are separated

---

[93] I take judicial notice of the proximity of the chicken houses to the properties at issue, but note that my decision would be the same without consideration of the chicken houses.

20

by at least 150 feet.[94]  Behind her home are open fields.  I take judicial notice that such fields must be fertilized and worked by large farm equipment driven by internal combustion engines.   In front of the Foulke and Walker properties is a public road, also traversed by cars and commercial vehicles similarly powered.  Further to the rear are chicken houses.  Closer to the Foulke residence than the Shop are the outbuildings in which Foulke keeps her horses.  The evidence as a whole is insufficient to convince me that the odors emanating from the Shop are unreasonable or sufficient, in light of the character of the neighborhood, to prevent the quiet enjoyment of adjacent properties.

### c. Traffic

It appears that Walker's and Foulke's primary complaint involves the use of Summer Place by Williams and his friends to enter the Shop with their vehicles, on which Williams and his friends then perform maintenance and repair.  I have no doubt that Williams is a gregarious fellow, that he enjoys spending time in companionship with his many friends in what he terms his "man-cave," that he enjoys helping others work on automobiles, and that he is an enthusiastic congregant in his church and enjoys sharing Christian fellowship as well.  In other words,

---

[94] Foulke testified that her home sits only 100 feet from the Shop, Trial Tr. 44:13 (Foulke), but I find this contention unconvincing after examining the Division Survey Plan submitted by the parties.  *See* JX 2.  The plan clearly demonstrates that Foulke's home is situated *further* away from Williams' Shop than is Walker's property line, which is labeled as 143.1 feet from the Shop.  *Id.*

21

Williams frequently entertains friends. These friends drive to his property over Summer Place, which is located in the Easement that burdens the Walker property. Other drivers, including his daughter and her friend, also live in the Williams residence as well and traverse Summer Place regularly.

Both Williams and Foulke, in the somewhat obsessive manner unfortunately not uncommon in disputes between neighbors, keep track of trips across the Easement, which I find to average five per day, and sometimes three times that. The strikes me as a rather heavy, but not unreasonable, use of a private driveway. Foulke complains that occasionally Summer Place is used by vehicles late at night or early in the morning. That is also not unusual for a private driveway and, in light of the twenty-four hour use of the nearby public road, not particularly problematic to a person of normal sensibilities. I find, keeping in mind the character of the properties, the evidence is insufficient to convince me that the traffic using Summer Place constitutes a nuisance.[95]

### d. The Cumulative Effect of the Use of the Shop

I have carefully considered the burden placed on the Plaintiffs by the noise, smells, and traffic associated with Williams' use of the Shop. For all the reasons above, even considered *in toto*, the Plaintiffs have failed to demonstrate that a property owner of average sensibilities would find the quiet enjoyment of her

---

[95] I analyze the burden Williams places on the easement in Part II.B.3, *infra.*

property prevented by the activities in Williams' Shop, so as to constitute a private nuisance. I make this finding despite the fact that Foulke and Walker are sincere when they represent that they feel heavily burdened, even oppressed, by Williams' use of the property. Under an objective standard, I cannot find that Williams' activities amount to a nuisance.

In arguing the contrary, the Plaintiffs rely on *Laumbach v. Westgate*,[96] a case in this Court also involving complaints by neighbors against the use of a residential property for auto repair. The Court there enjoined the activity. *Laumbach* is distinguishable, however. The auto repair—and body-and-fender work—in *Laumbach* exceeded in obnoxiousness Williams' activities here: the Defendant there polluted his neighbor's property and strewed his lot with rusty metal and other unsightly detritus, for example.[97] More fundamentally, the parties in *Laumbach* chose to live in a residential development in which each resident's property rights were limited by deed restrictions. The finding of the Court was that, in light of the nature of the neighborhood, the use of the defendant's residential lot for auto and body-and-fender work in an 'eyesore" of a Quonset hut, was noxious in a way that violated the deed restrictions, which broadly limited use of one property in a way

---

[96] 2008 WL 3846419 (Del. Ch. Aug. 19, 2008).
[97] "Robert Westgate welded, sandblasted, and spray painted various cars on his property and he pressure washed the insides of engines, allowing the grime to seep into the Laumbachs' yard and public sewers. These were not isolated instances, they were persistent." *Id.* at *6.

23

causing "offense" or "annoyance" to neighbors. The parties here, by contrast, chose a different property regime; they live in a mixed agricultural and residential area not constrained by deed restrictions (with the exception of the limited restrictions burdening Proposed Lot A not here at issue) or municipal ordinances. I do not find my decision here in conflict with *Laumbach.*

### 3. Burden on the Easement

When Williams subdivided his lot, he retained by deed the Easement over what is now the Walker property, for ingress and egress from Martins Farm Road. No additional usage was provided in the Lot A Deed for the Easement, and no explicit restrictions were placed thereon; I find that the Easement was meant to provide access to the William's property consistent with its use as a residential property. Summer Place lane runs over the Easement. I have already found that the traffic currently using Summer Place is not excessive for a residential driveway.

Walker's allegations, supported by the evidence, go beyond frequency of use, however. The Easement is being used, in conjunction with the auto-repair work on the Williams property, for parking automobiles; and Summer Place is being used as a test track to try the condition of automobiles, before and after repair. The intended use of the Easement is only for ingress or egress. Its use must not burden the Walker

property beyond the extent expressed in the Lot A Deed.[98] That use did not contemplate the short-term storage and parking of cars nor the use of Summer Place as an auto-repair test track. Walker is entitled to an injunction limiting the use of the Easement by Williams and his guests to traversing the Walker property for access to and from Williams' house or shop.

Finally, Walker asks for an order or declaration that he may post signage near or speed bumps on Summer Place lane. I note that Williams has not responded to this request at trial or in briefing, and that nothing explicit in the deed language creating the Easement prohibits such improvements, so long as they do not impede Williams' right of ingress to his property.

*C. Claims Based on the County Code*

I find the briefing insufficient to allow me to economically decide these claims. I will convene an office conference promptly to discuss supplemental briefing with counsel.

## III. CONCLUSION

Nuisance doctrine is but a blunt tool to resolve disputes among neighbors. It is clear from the testimony that the Plaintiffs feel oppressed by the activities at

---

[98] *See, e.g.*, *Hammond v. Dutton*, 1978 WL 22451, at *1 n.8 (Del. Ch. Dec. 20, 1978) ("A principle which underlies the use of all easements is that the owner of the easement cannot materially increase the burden of the servient estate or impose thereon a new and additional burden . . . . And, [if] he exceeds his rights either in the manner or in the extent of its use, he becomes a trespasser to the extent of the unauthorized use.") (citation omitted).

Williams' Shop, and that Williams, for his part, believes that his neighbors exaggerate their concerns based on personal enmity towards him, and that he has attempted reasonable accommodation of those concerns. If I were attempting to settle this mater, instead of determining property rights post-trial, I would urge Williams, to the extent he has not already done so, to limit his hobby to reasonable hours, to work inside the Shop with the doors closed to reduce noise, and to ensure his friends behave in a civil and courteous manner. I would similarly urge the Plaintiffs to end their surveillance of Williams' home, shop, and driveway, to be tolerant when they can, and to be respectful when seeking Williams' restraint of activity that exceeds that tolerance. Instead, however, I must simply rule on the Plaintiffs' claims.

The Plaintiffs' request for a declaratory judgment that Williams' use of his Shop for auto repair constitutes a common-law nuisance is denied, and the associated request for injunctive relief is denied. I reserve decision on the Plaintiffs' County Code-based claims. Walker's request for equitable relief based on the use by Williams and his guests of the Easement, beyond the use provided for by deed, is granted. The parties should provide me with a form of order implementing these decisions.